USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/8/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
:
KEISHA ARCHIBALD, et al.,                                              :
                                                                       :
                           Plaintiffs,                                 :
                                                                       :        24-cv-5919 (LJL)
          -v-                                                          :
                                                                       :        OPINION AND ORDER
DAVID C. BANKS, et al.,                                                :
                                                                       :
                           Defendants.                                 :
                                                                       :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Keisha Archibald ("Plaintiff"), individually and as parent and natural guardian of N.A., brings this action challenging the decision of a state review officer ("SRO") finding that her child N.A. was denied a free appropriate public education ("FAPE") but nonetheless denying funding for one-to-one ("1:1") nursing services. Dkt. No. 1. The New York City Department of Education ("DOE") and David C. Banks, in his official capacity as Chancellor of the New York City Department of Education (together with DOE, "Defendants") and Plaintiff cross-move for summary judgment. For the reasons that follow, Plaintiff's motion for summary judgment is DENIED, and Defendants' cross-motion for summary judgment is GRANTED.

## BACKGROUND

### I.     Statutory and Regulatory Background

Congress enacted the Individuals with Disabilities Education Act ("IDEA") with the goal of ensuring "that all children with disabilities have available to them a free and appropriate public education . . . designed to meet their unique needs . . . and to ensure that the rights of children with disabilities and the parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)–(B). "The IDEA offers federal funds to states that develop plans to assure all children with disabilities

residing in each such state a free appropriate public education." *See M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 223 (2d Cir. 2012) (citations and alterations omitted). The centerpiece of the IDEA's educational guarantees is the individualized education program ("IEP"), which must be designed to provide a FAPE and which school districts must implement each year for children with disabilities. *Id.* An IEP is a "written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)), *opinion amended on denial of reh'g*, 480 F.3d 138 (2d Cir. 2007). "The IEP is to be developed jointly by a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate, the child." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368 (1985). A FAPE is provided where the IEP is (1) "developed in accordance with the procedures laid out in the IDEA," and (2) "reasonably calculated to enable the child to receive educational benefits." *T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 151 (2d Cir. 2014). The IDEA guarantees each student an "appropriate" education, but not "everything that might be thought desirable by loving parents." *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d 119, 132 (2d Cir.1998) (quoting *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir. 1989)); *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 189–90 (1982) (explaining that the IDEA "contains no requirement . . . that States maximize the potential of handicapped children commensurate with the opportunity provided to other children") (internal citations omitted).

New York State "has assigned responsibility for developing appropriate IEPs to local

Committees on Special Education ('CSE'), the members of which are appointed by school boards or the trustees of school districts." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007). "The CSE is composed of several individuals, including the parents, the student's special education teacher, a school psychologist, a school district representative knowledgeable about the district's resources, a school physician, and a parent representative." *Thomason v. Porter*, 2023 WL 1966207, at *6 (S.D.N.Y. Feb. 13, 2023) (citing N.Y. Educ. Law § 4402(1)(b)(1)(a), *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012)).

If a New York parent believes an IEP is insufficient under the IDEA or that the child is not being provided a FAPE, the parent "may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district by filing what is known as a due process complaint." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (citation omitted). If a parent does so, it is "at their own financial risk." *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993) (quoting *Burlington.*, 471 U.S. at 373–74). A school district is required to pay for the program selected by the parent if, under what is known as the *Burlington*/*Carter* test, "(1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable considerations favor reimbursement." *T.M.*, 752 F.3d at 152 (citing *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013)); *see Florence Cnty.*, 510 U.S. at 12–16; *Burlington*, 471 U.S. at 373–74. "The first two prongs of the [*Burlington/Carter*] test generally constitute a binary inquiry that determines whether or not relief is warranted, while the third enables a court to determine the appropriate amount of reimbursement, if any." *A.P. v. N.Y.C. Dep't of Educ.*, 2024 WL 763386, at *2 (2d Cir. Feb. 26, 2024) (summary order).

A parent's filing of the due process complaint triggers a hearing conducted before an

Impartial Hearing Officer ("IHO") appointed by the local board of education. *See M.H.*, 685 F.3d at 224–25. The IHO's decision may be appealed by either party to a State Review Officer ("SRO"), an officer of the New York State Department of Education. *See id.* at 225. Following a decision, the "'party aggrieved' by the findings of the SRO 'shall have the right to bring a civil action' in either state or federal court." *Id.* (quoting 20 U.S.C. § 1415(i)(2)(A)).

## II.     Factual Background

N.A. is a minor child with a disability as defined by 20 U.S.C. § 1401(3). Dkt. No. 1 ¶ 33 (the "Complaint"). N.A. is diagnosed with seizure disorder, holoprosencephaly, ventriculoperitoneal shunt, and syndrome of inappropriate diuretic hormone secretion. Dkt. No. 14-1 at 27.[1] At the start of the extended 2023–2024 school year, N.A. was eight years old. Compl. ¶ 32.

On March 23, 2023, DOE convened a CSE to develop an IEP for N.A. for the 2023–2024 school year ("March 2023 IEP"). *Id.* ¶ 48. The March 2023 IEP recommended, among other things, (1) paraprofessional individual service, daily and full time, and (2) school nurse service, daily as needed. Dkt. No. 14-1 at 28. The placement recommendation was a DOE specialized school, District 75. *Id.*

Plaintiff disagreed with the March 2023 IEP and decided to re-enroll N.A. at iBRAIN, where N.A. was previously enrolled for the 2022–2023 school year, for the 2023–2024 extended school year. Compl. ¶ 49. Plaintiff sent DOE a ten-day notice dated June 20, 2023, to inform DOE that she disagreed with the DOE's educational placement recommendations and intended to re-enroll N.A. at iBRAIN and seek public funding for the placement. *Id.* ¶ 50.[2]

---

[1] This opinion will refer to the administrative record by ECF pagination.
[2] Under the IDEA, the "cost of reimbursement . . . may be reduced or denied" if "10 business days . . . prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described." 20 U.S.C. § 1412(a)(10)(C)(iii)(I). Although

4

On July 5, 2023, Plaintiff filed a due process complaint, alleging, *inter alia*, that DOE denied N.A. a FAPE for the 2023–2024 extended school year, that iBRAIN was an appropriate unilateral placement, and that equitable considerations favored total direct funding for N.A.'s placement at iBRAIN including related services, nursing services, and special transportation services. *Id.* ¶ 51.

Plaintiff's due process complaint was assigned IHO Case No. 250848 and was heard by IHO Mohammad Ezzati. *Id.* ¶¶ 52–53. On December 11, 2023, IHO Ezzati issued a Findings of Fact and Decision, finding that DOE offered a FAPE to N.A. for the 2023–2024 extended school year. IHO Ezzati also concluded that, had DOE not offered N.A. a FAPE, that iBRAIN was an appropriate unilateral placement, but that in any event, he would not have awarded full tuition reimbursement to Plaintiff based on equitable considerations. *Id.* ¶¶ 54–55; Dkt. No. 14-1 at 36. The IHO found as follows:

> Parent also alleges that a 1:1 nurse is critical and the DOE's failure to recommend such in the 2023 IEP resulted in an inappropriate program on its face. Parent's position is not supported by the record. The 2023 IEP recommended School Nurse services (individual service, daily, as needed). Medical documents indicate that Student is prescribed a number of medications, her intake of liquids must be monitored, and she requires a paraprofessional to prevent falls due to a brain shunt. Pursuant to the medical documentation, the DOE recommended a Paraprofesional (Health and Ambulation) and School Nurse services (individual service, daily, as needed) for, among other things, ambulation, safety of movement, and administration of medication. The Social History Updated dated January 12, 2023 states: "[Student] takes seizure medication before school and when she goes to bed." "[Student] takes medication for that SIDH. [Student's] mom mixes the pills with her juice and the nurses see that she drinks." Moreover, the medical documentation states that the last episode of seizure occurred in 2018, over five years ago. Accordingly, I find that the DOE's recommendation of School Nurse

---

failure to provide such a notice does not "bar parents from enrolling their child in another school without such notice," the statue and regulations "establish a powerful incentive to give such notice." *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 159 (2d Cir. 2021). The purpose of the notice is to "make it possible for the public school to reassess the IEP and cure any deficiency in it, thus minimizing the school's expense by allowing it to adjust its plans and provide the child with what the parents, at least, consider to be a FAPE." *Id.*

5

services (individual service, daily, as need) and a Paraprofessional for Health and Ambulation (individual service, daily, full time) was appropriate, and that a 1:1 nurse was not required.

*Id.* at 33. The IHO went on to observe too that there was no evidence in the record that N.A. received a 1:1 nurse during the 2022–2023 or 2023–2024 school years at iBRAIN and that the documentary evidence was inconsistent with the claim that N.A. received such service. *Id.*

Plaintiff timely appealed IHO Ezzati's decision to the New York State Education Department's Office of State Review ("OSR") and the appeal was assigned SRO Appeal No. 24-028. Compl. ¶¶ 56–57. On April 3, 2024, SRO Carol H. Hauge issued her decision. *Id.* ¶ 58. She determined that DOE did not offer N.A. a FAPE for the 2023–2024 extended school year and that Plaintiff's unilateral placement at iBRAIN was appropriate for N.A. during the 2023–2024 extended school year. *Id.* ¶¶ 59–60; Dkt. No. 14-1 at 11, 16. She also determined that Plaintiff was entitled to direct funding of a portion of N.A.'s base tuition and the cost of contracted transportation services but was not entitled to funding of supplemental tuition for related services or for 1:1 nursing services. *Id.* at 24. With respect to nursing services, the SRO found insufficient reason to depart from the determination of the IHO that Plaintiff was not entitled to funding, noting that the record did not support a finding that N.A. actually received 1:1 nursing services at iBRAIN for the 2023–2024 extended school year and that Plaintiff did not appeal from the IHO's credibility findings regarding said nursing services. *Id.* at 13.

## PROCEDURAL HISTORY

Plaintiff filed this complaint on August 5, 2024. *See* Compl. Defendants answered on October 11, 2024. Dkt. No. 8. On January 19, 2025, Plaintiff moved for summary judgment and filed a memorandum of law in support of that motion. Dkt. Nos. 16–17. Defendants filed a cross-motion for summary judgment and a memorandum of law in support of that motion and in opposition to Plaintiff's motion for summary judgment on February 28, 2025. Dkt. Nos. 18–19.

On April 4, 2025, Plaintiff filed a memorandum of law in opposition to the cross-motion for summary judgment and in support of Plaintiff's motion. Dkt. No. 20. On April 18, 2025, Defendants filed a reply memorandum of law in further support of their cross-motion for summary judgment. Dkt. No. 21.

## LEGAL STANDARD

"Although the parties have styled their submissions as motions for summary judgment, 'the procedure is in substance an appeal from an administrative determination, not a summary judgment.'" *C.U. v. N.Y.C. Dep't of Educ.*, 23 F. Supp. 3d 210, 222 (S.D.N.Y. 2014) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)). As such, adjudicating an IDEA case at summary judgment "involves more than looking into disputed issues of fact; rather it is a pragmatic procedural mechanism for reviewing administrative decisions." *R.E.*, 694 F.3d at 184. To that end, the court must "engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *Gagliardo*, 489 F.3d at 112; *see* 20 U.S.C. § 1415(i)(2)(C)(i)–(iii).

## DISCUSSION

Plaintiff argues that SRO Hauge erred to the extent that she found that equitable considerations did not permit reimbursement or direct funding for 1:1 nursing services, and that the equities favor and require full payment of 1:1 nursing services. Dkt. No. 17 at 1–2.

The Second Circuit has held that "a district court reviewing the substantive and procedural adequacy of an IEP at the first step of the *Burlington*/*Carter* test 'must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Ferreira v. Aviles-Ramos*, 120 F.4th 323, 330–31 (2d Cir. 2024) (quoting *A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)). However, "the

7

'substantial deference' that the IDEA requires for matters of educational policy is inapplicable to the equitable balancing called for at the third step of the *Burlington/Carter* test." *Id.* at 332. That conclusion follows from the statutory instruction that the court "grant such relief as *the court determines is appropriate*," 20 U.S.C. § 1415(i)(2)(C) (emphasis added), and from the fact that equitable balancing, unlike the questions of education policy addressed in steps one and two, is "an exercise of judgment that falls squarely within federal courts' expertise." *Ferreira*, 120 F.4th at 332. In undertaking its independent review of the equities based on a preponderance of the evidence, a court need not blind itself to the conclusions of the state administrators and may "consider an IHO and/or SRO's views of the equities for their 'power to persuade.'" *Id.* at 332 (quoting *Skidmore v. Swift*, 323 U.S. 134, 140 (1944)). The court reviewing a claim pursuant to Section 1415(i)(2) must "(1) 'engage in an independent review of the administrative record,' and (2) 'make a determination [of the balance of the equities] based on a preponderance of the evidence.'" *Id.* at 333 (quoting *Gagliardo*, 489 F.3d at 112). As to factual determinations underlying a state administrator's weighing of the equities, it is not error to adopt "the factual record as developed by the IHO" where no party has put forth new evidence. *Ferreira*, 120 F.3d at 333.

In making a determination as to the third step of *Burlington/Carter*, courts "enjoy[] broad discretion in considering equitable factors relevant to fashioning relief." *Gagliardo*, 489 F.3d at 112. "[T]he relief fashioned must be appropriate in light of the purpose of the [IDEA], which is to ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs." *Ferreira*, 120 F.4th at 330 (internal citations and quotations omitted). "Certain circumstances will counsel against reimbursement," such as whether "the cost of the private education was unreasonable," the

8

"parents unilaterally arrange[d] for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP," or "whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA." *Id.* (internal citations and quotations omitted). In *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 461 (2d Cir. 2014), the Second Circuit laid out a broader set of relevant factors "including, *inter alia,* whether plaintiff's unilateral withdrawal of her child from the public school was justified, whether plaintiff provided the Department with adequate notice of the withdrawal, whether the amount of private-school tuition was reasonable, whether plaintiff should have availed herself of need-based scholarships or other financial aid from the private school, and whether there was any fraud or collusion in generating (or inflating) the tuition to be charged to the Department, or whether the arrangement with the school was fraudulent or collusive in any other respect." *Id.*

It is the burden of the parents to demonstrate by a preponderance of the evidence "that the equities favor them," *R.E.*, 694 F.3d at 185, including that "the cost of the private services is reasonable," *Still v. DeBuono*, 101 F.3d 888, 893 (2d Cir. 1996) (interpreting separate provision of the IDEA that requires states to provide appropriate services for disabled infants and toddlers). "The appropriate amount [of reimbursement] bears a relationship to the quantum of services that the state would have been required to furnish." *Id.* A plaintiff is required to show by a preponderance that "the services for which she is seeking reimbursement were 'appropriate to the child's needs.'" *Landsman v. Banks*, 2024 WL 3605970, at *5 (S.D.N.Y. July 31, 2024) (quoting *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 76 (2d Cir. 2014)). The state is required to provide a "related service" under the IDEA, 20 U.S.C. § 1401(9), if that service is one that "may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A); *see also* 34 C.F.R. § 300.34(a); *Khanimova v. Aviles-Ramos*, 2025 WL 1266891, at

\*6 (S.D.N.Y. Apr. 30, 2025).

Plaintiff asks this Court to determine, contrary to the conclusions of the IHO and SRO, that direct funding for 1:1 nursing services was necessary and appropriate for N.A. to receive a FAPE. She relies on her own testimony and the testimony of the iBRAIN director Caleb Asomugha ("Asomugha") at the hearing before the IHO. Plaintiff points also to a contract between Plaintiff and B&H Healthcare ("B&H) for the provision of nursing services. Plaintiff does not seek to introduce any new evidence outside of what was considered by the state administrators.[3]

Plaintiff made the argument before IHO Ezzati and the SRO Hauge that N.A. would be denied a FAPE under the first step of the *Burlington/Carter* test absent provision of 1:1 nursing services. *See* Dkt. No. 14-1 at 33 (Plaintiff's argument on appeal to SRO that failure of IEP to include a 1:1 nurse "resulted in an inappropriate program on its face."). IHO Ezzati rejected that position as "not supported by the record" because there was no evidence that (1) such services were required or that (2) they were provided during student's placement at iBRAIN. *Id.* The IHO also found the testimony of Plaintiff and of Asomugha that N.A. required 1:1 nursing services not to be credible. *Id.* at 34. Accordingly, the IHO concluded that even if he had determined N.A. was denied a FAPE, he would have "denied Parent's request for funding of nursing services" in the amount of $265,960.00 under the third step of *Burlington/Carter* because "not only did Student not require 1:1 nursing services but the record also does not support a finding that 1:1 nursing services are being provided during the 2023–2024 school year." *Id.* at 40. On appeal, SRO Hauge did not disturb the IHO's conclusion that the exclusion of 1:1 nursing services from N.A.'s IEP resulted in a denial of a FAPE. However, the SRO reversed the IHO as to its "[f]inding regarding

---

[3] Courts in this district have been reluctant to allow the parent to introduce additional evidence when that evidence was available to the parent at the time of the IHO hearing. *See Landsman*, 2024 WL 3605970, at \*3 (citing cases). The Court has no occasion to consider that issue here.

10

the appropriateness of the district's special transportation accommodation," and on that basis determined that the state IEP failed to provide a FAPE. *Id.* at 20.[4]  However, the SRO concluded that there was not "sufficient basis to depart from the IHO's credibility finding which underpinned his related determination that equitable considerations weighed against awarding the parent any of her requested relief for nursing services." *Id.* at 23.  Specifically, the SRO noted that the parent "did not appeal from the IHO's finding that the hearing record did not support finding that the student actually received 1:1 nursing services at iBrain for the 2023–2024 school year," *id.* at 21, and that "neither non-testimony evidence in the hearing record nor the hearing record read in its entirety compels a contrary conclusion with regard to the credibility of the witnesses," *id.* at 23.

Applying the *Ferreira* "independent review" standard to the equitable determination made by the IHO and SRO, the Court reaches the same conclusion it would have if addressing the necessity of nursing services under the *A.C.* "due weight standard." 553 F.3d at 171.  Plaintiff has not satisfied her burden to show that the equities require reimbursement or direct funding of 1:1 nursing services.

The record does not show that 1:1 nursing services were necessary for N.A. to receive a FAPE.  First, iBRAIN's Report and Education Plan itself did not state that N.A. needed full-time 1:1 nursing services.  Dkt. No. 14-3 at 83.  It stated that she "need[ed] moderate assistance from her paraprofessional, teacher, and her family with her mobility, transfer, safety awareness, hygiene and other activities of daily living at school and at home," *id.*, without mentioning 1:1 full-time

---

[4] Because "neither party" appealed the IHO's finding in the alternative that "iBrain was an appropriate unilateral placement," "that finding [became] final and binding on the parties and [was] not be reviewed on appeal." *Id.* at 16.  Plaintiff's enrollment at iBRAIN was therefore appropriate under step 2of the *Burlington/Carter* standard; in other words, the "binary inquiry that determines whether or not relief is warranted" was granted in N.A.'s favor. *Ferreira*, 120 F.4th at 329.

11

nursing services, *see also id.* at 91 (noting that N.A. "requires a 1:1 paraprofessional to support her medical, physical, cognitive, and sensory needs throughout the day"). Indeed, the only recommendation that the iBRAIN IEP made with respect to nursing services was that N.A. have the ability to use the services of the school nurse. *Id.* at 137.

As the IHO also found, the evidence did not support that N.A. ever received 1:1 nursing services during her time at iBRAIN. The DOE conducted a classroom observation of N.A. at iBRAIN on January 20, 2023. Dkt. No. 14-8 at 13. The observer noted that a teacher, a physical therapy provider, and a class aide were present and that the paraprofessional left the room, without any finding that a 1:1 nurse was present. *Id.* Plaintiff also made no mention of 1:1 nursing services in her affidavit listing the services received by N.A. at iBRAIN, stating only that N.A. "requires a full time 1:1 paraprofessional." Dkt. No. 14-6 at 7. Plaintiff testified at her deposition that the affidavit was "true." Dkt. No. 14-10 at 319. Likewise, Asomugha's affidavit exhaustively detailed the services provided to N.A. (including class size, needs, therapy, technology, etc.) but did not mention 1:1 nursing services. Dkt. No. 14-6 at 5–6. Asomugha confirmed at deposition that his affidavit made no reference to N.A. needing 1:1 nursing services, Dkt. No. 14-10 at 382, and that his affidavit supported only N.A.'s need for a paraprofessional. *Id.* at 384.

Plaintiff has failed to present medical documentation or evidence that N.A. requires a 1:1 full-time nurse. *See Khanimova*, 2025 WL 1266891, at *6; *Landsman,* 2024 WL 3605970, at *5 (where a plaintiff has sought reimbursement for services that "were not prescribed by a doctor and not recommended within the student's IEP," and where they have also "failed to provide adequate justification" from other sources, a plaintiff "has not demonstrated that the services which she is seeking reimbursement were appropriate"). The Seizure Medication Administration Form prepared by N.A.'s doctor in September 2022 reflects that N.A.'s last seizure was in 2018. Dkt.

No. 14-8 at 92; *see also* Dkt. No. 14-9 at 9 (same). Under "supervision needed," it states "para needs to shadow her so she doesn't fall, hit head, or dislodge her brain shunt." Dkt. No. 14-8 at 91. The report reflects that N.A. is neither medically unstable nor behaviorally unstable. *Id.* The Social History Update for N.A. prepared in January 2023 does reflect Plaintiff's self-report that N.A. started having seizures again in 2020 but it also indicates that N.A. takes seizure medication before school and when she goes to bed without any indication that such medication is ineffective or that N.A. needs full-time nursing services. Dkt. No. 14-8 at 9. The Social History does not cite to any medical documentation.

Plaintiff points to her deposition testimony and that of Asomugha as evidence that N.A. requires a full-time nurse, but that testimony contains conspicuous weaknesses. Plaintiff presents only the testimony of Asomugha and herself as parent during the November 2023 hearing. Plaintiff indicated at the outset of the due process hearing that N.A. required full-time nursing services:

> MR. ALBERT: [D]o you know whether or not [N.A.] currently receives one-to-one nursing services at the iBRAIN school?
>
> MS. ARCHIBALD: Yes.[5]
>
> MR. ALBERT: Okay. Could you tell us why she receives those services in your own words?
>
> MS. ARCHIBALD: Okay. She receives the nurse services because number one, [N.A.'s] safety comes first. And number two, she has a lot of diagnoses. For example, she has hydrocephalus. She's also (indiscernible). She also has a VP shunt that was implanted in her head at five months and she's also had seizures.
>
> So it would be very important if [N.A.] has that nurse by her side at all times in case of emergency. Someone is there to administer the medication that she needs until she gets to 911 to the hospital. So it is very important if she has a nurse with her at all times, because, for example the seizures. We don't know when it's going to come. It just happens. And then, God forbid, she falls and hits her head and she's not supposed to hit her head because she has a shunt in her head that could be

---

[5] As a literal matter, Plaintiff testified only that she knew whether N.A. received full-time nursing services and not that N.A. in fact received such services. The Court nonetheless construes her testimony to reflect Plaintiff's belief that N.A. received such services.

more life threatening for her. So it is – I would say it is very important for her to have a nurse by her side at all times.

Dkt. No. 14-10 at 269–70.

Plaintiff's testimony as N.A.'s parent is inherently less credible given her "interest in the outcome of the case." 4 L. Sand et al., Modern Federal Jury Instructions ¶ 1.14 (2025). Plaintiff also nowhere testifies that she was present at iBRAIN to observe whether N.A. received 1:1 nursing services.

As the IHO observed, Plaintiff's testimony was inconsistent with her affidavit, which was prepared with the assistance of counsel. Dkt. No. 14-1 at 38. As noted, in her affidavit prepared in October 2023, she made no mention whatsoever of the need for 1:1 nursing services. *See* Dkt. No. 14-6 at 7. Her testimony before the IHO that it was "very important" that N.A. have a "nurse by her side at all times" thus appears to reflect a newfound belief. Indeed, Plaintiff testified that a 1:1 nurse was provided at the suggestion of iBRAIN itself (the organization that did not list 1:1 nursing services as required in the IEP), rather than on Plaintiff's own suggestion. Dkt. No. 14-10 at 303. Although Plaintiff was able to quickly recall the names of N.A.'s non-nurse providers, *id.* at 331, she offered no details about the nurse that was always allegedly with her child during the school day.

Asomugha also stated that N.A. receives 1:1 nursing services and explained his understanding of the reason for such services:

MR. ASOMUGHA: Yes. So [N.A.] receives one-to-one nursing services because she has a history of seizures, and her nurse needs to be present with her at all times in order to monitor seizure-like activities, as well as administer her medication. She has also a shunt in her head and that would restrict her from getting into certain positions. For example, she can't lay down flat, and she can't lean over, and she – she's unable – or she wouldn't be able to hit her head. And so her nurse needs to be present for that as well in order to monitor that.

And then also, [N.A.], she – is ambulation, she has an unsteady gait, and this tends to predispose her to a lot of falls. And just, you know, for what I mentioned earlier,

14

>she's unable to get in certain positions.  So the nurse is able to – the – the nurse is present in order to monitor those as well.

Dkt. No. 14-10 at 363.

However, as was clear from the cross-examination, Asomugha had insufficient personal knowledge upon which to base those conclusions.  Asomugha was only at the Brooklyn campus where N.A. attended classes two to three days a week and observed N.A.'s classroom only a few times a day.  Dkt. No. 14-10 at 376.  More important, Asomugha is deputy director of special education and does not oversee related services, such as nursing and transportation.  *Id.* at 377; *see Khanimova*, 2025 WL 1266891, at *5 (observing of Asomugha testimony that many questions about iBRAIN's offerings and services were "beyond his scope").  *Id.*  Asomugha's testimony was riddled with inconsistencies.  When asked how what a 1:1 nurse would do for N.A. that the 1:1 paraprofessional did not do, Asomugha offered only that the nurse "administers medication."  *Id.* at 384.  But Asomugha then could not testify to the frequency that such medication was provided so as to support the need for a full-time nurse.  *Id.*  Asomugha testified that the school nurse could not administer medication because she was "not able to be present with the student at all times to monitor for seizure-like activities or to provide any direct intervention when it is needed," *id.* at 385, but then admitted that there are only twenty-four students at iBRAIN for the one nurse, *id.*  Asomugha further admitted that it would take just one minute for him to walk from the nurse's office to N.A.'s classroom.  *Id.* at 387.  Asomugha admitted that he had little information as to nursing at iBRAIN as a general matter, as it is "not a part of my scope," and so his testimony "may not be 100 percent accurate."  *Id.* at 403.

Asomugha's hearing testimony was inconsistent with his pre-hearing affidavit, which made no mention of 1:1 full time nursing services.  Dkt. No. 6 at 5.  As the IHO also concluded, Asomugha's testimony was not credible or reliable.  Dkt. No. 14-1 at 38.  For example, he testified

15

that teacher notes on sessions with students were not uploaded to the school's "dashboard" system, in direct contradiction to prior testimony that the dashboard system did allow teachers to provide and maintain their session notes. Dkt. No. 14-10 at 432–34. He also was unable to answer whether there was an employee at iBRAIN responsible for coordinating nursing services and transportation services. *Id.* at 406–07. Finally, he testified also that it was his own responsibility to ensure that the iBRAIN IEP was accurate and that it did not list 1:1 nursing services. *Id.* at 381–82.

Plaintiff also points to a nursing contract signed by her with B&H. Dkt. No. 14-3 at 73–80. That Annual Nursing Services Agreement ("Nursing Services Agreement") provides for "1:1 Private Nursing services during SCHOOL DAYS." *Id.* at 73. The contract would have evidentiary weight if there also was evidence that Plaintiff had actually paid for, or would be required to pay for, those services. That Plaintiff paid or obligated herself to pay significant sums for full-time 1:1 nursing services might support at least a well-founded belief by Plaintiff that such services were necessary. But there is no such evidence. The Nursing Services Agreement reflects the contemplation of the parties that the provider will be paid from funds provided by Defendant. If Defendant does not pay, then Plaintiff's obligation to pay will be subject to a "reasonable payment plan." *Id.* at 74–76. Indeed, Plaintiff testified that she was not sure if she would have to pay the provider if N.A. withdrew from iBRAIN in the event the state did not fund the placement. *See* Dkt. No. 14-10 at 333–34.

In sum, the Court concludes based on an independent review of the administrative record that Plaintiff has not proven by a preponderance that "the services for which she is seeking reimbursement were 'appropriate to the child's needs.'" *Landsman*, 2024 WL 3605970, at *5.

The Court's consideration of the IHO's and SRO's views for their "power to persuade," *see Ferreira*, 120 F.4th at 332–33 (quoting *Skidmore*, 323 U.S. at 140), only bolsters the Court's

16

conclusions here. The IHO concluded that N.A. was not entitled to reimbursement for nursing services at the first or third step of the *Burlington/Carter* test, and the SRO reviewed the IHO's discussion of N.A.'s IEP in her decision. The Court therefore considers the findings of the IHO as "adopted" by the SRO. Dkt. No. 14-1 at 17; *see M.H.*, 685 F.3d at 252 (noting that where the "SRO did not reach the question," the district court properly relied on the findings of the IHO). IHO Ezzati's Findings of Fact and Decision was both thorough and reasonable, *see Estate of Landers v. Leavitt*, 545 F.3d 98, 107 (2d Cir. 2008), and his conclusions are "persuasive" confirmation of the Court's own determination. IHO Ezatti's determinations have weight both because he had the opportunity to observe the witnesses and because his conclusions were "based on the substantially greater familiarity with the evidence and the witnesses than the reviewing court." *K.C. v. Chappaqua Cent. Sch. Dist.*, 2019 WL 6907533, at *7 (S.D.N.Y. Dec. 19, 2019). The IHO found that the student's clinical status as to seizures was "controlled," that the student is "not considered to be medically unstable," and that "the last episode of seizures occurred in 2018, over five years ago." Dkt. No. 14-1 at 33. The IHO therefore determined that the IEP's recommendation of "School Nurse services (individual service, daily, as needed) and a Paraprofessional for Health and Ambulation (individual service, daily, full time) was appropriate, and that a 1:1 nurse was not required." *Id.* The IHO found that "there is no evidence in the record that Student received 1:1 nursing during the 2022–2023 or 2023–2024 school years at Private School." Dkt. No. 14-1 at 33–34. The Court has confirmed that those conclusions are supported by the evidentiary record.

In the end, Plaintiff asks the Court to determine as an equitable matter under the third step of the *Burlington/Carter* test that N.A. needed services for a FAPE at a private school that the IHO and SRO determined, with their educational expertise, that N.A. did not need for a FAPE at a

17

public school under the first step. That conclusion might be permissible if there was new evidence that was not presented to the IHO or SRO or if N.A. had needs at the private school that N.A. would not also have had at the public school. But Plaintiff offers the Court no new evidence. And the IHO and SRO found in well-reasoned and supported opinions, which are not challenged here, that N.A. did not receive those services at the private school. For that additional reason, the Court concludes that Plaintiff has not proven by the requisite preponderance of the evidence that she is entitled to reimbursement for 1:1 nursing services.[6]

## CONCLUSION

Plaintiff's motion for summary judgment is DENIED, and the Defendants' cross-motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 16, 18.

SO ORDERED.

Dated: September 8, 2025
New York, New York

LEWIS J. LIMAN
United States District Judge

---

[6] The parties do not address Plaintiff's second cause of action for attorney's fees under 20 U.S.C. § 1415(i)(3)(B)(I) and 34 C.F.R. § 300.517(a)(1)(i). *See* Dkt. No. 1 ¶¶ 79–84.